# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | |
|---|---|
| ABIEZER FRAGA and CHARLES WILLIAMS, | **CASE NO. 22-20105-CIV-ALTONAGA** |
| on behalf of themselves and all others similarly situated, | **CLASS ACTION** |
| Plaintiffs, | |
| vs. | |
| UKG INC., | |
| Defendant. | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Abiezer Fraga and Charles Williams ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Amended Class Action Complaint against UKG Inc. ("UKG" or "Defendant"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1.       Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard personal identifiable information that it acquired from thousands of its customers about their employees.  Defendant acquired the employees' information in the course of providing its workforce management solution to its customers.  The employee information at issue includes, without limitation, names, mailing addresses, email addresses, and/or Social Security numbers (collectively, "personal identifiable information" or "PII").

2.       Thousands of Defendant's customers store their workforce data in the "Kronos Private Cloud," which "is designed to host a variety of applications, including Workforce Central."

3.      Defendant's "Workforce Central" products allows Defendant's customers to, among other things, "[m]anage schedules, track time and attendance, administer absence and leave, and measure productivity – all streamlined through automation."[1]

4.      In the course of their employment, employees of Defendant's customers entrust and provide to Defendant an extensive amount of PII.  Defendant retains this information on computer hardware in the Kronos Private Cloud.  Defendant acknowledges that it understands the importance of protecting information.

5.      On or around December 11, 2021, Defendant determined that an unauthorized actor obtained unauthorized access to the Kronos Private Cloud as part of a ransomware attack (the "Cybersecurity Incident").

6.      The unauthorized actor may have accessed the PII of employees of Defendant's customers, including Plaintiff and Class Members.

7.      On December 13, 2021, Defendant posted on its website a copy of a communication it had sent to its "impacted Kronos Private Cloud (KPC) customers" regarding the Cybersecurity Incident (the "Website Notice").[2]

8.      On December 13, 2021, the City of Cleveland advised that, as a result of the Cybersecurity Incident, "[s]ome of the data accessed may have included some employees' first and last names, addresses, last four of the SSN, and employee ID."[3]

---

[1] *See* https://www.kronos.com/products/workforce-central-suite (last visited Jan. 6, 2022).

[2] Exhibit A at 1, *available at* https://community.kronos.com/s/feed/0D54M00004wJKHiSAO?language=en_US (last visited Jan. 6, 2022).

[3] Exhibit B at 1, *available at* https://clecityhall.com/2021/12/13/city-of-cleveland-statement-on-ultimate-kronos-group-cybersecurity-incident/ (last visited Jan. 6, 2022).

2

9.     On or around December 17, 2021, Defendant posted on its website "New Questions & Answers for Impacted and Non-Impacted Customers" that, among other things, stated the following question and answer:

> **Precisely what information was accessed or exposed?**
> Our investigation is ongoing and we are working diligently to determine if customer data has been compromised.[4]

10.    On or around December 6, 2021, in responding to the Cybersecurity Incident, Defendant confirmed that the Kronos Private Cloud "houses thousands of customers and each customer's environment needs to be addressed individually."[5]

11.    On or around December 28, 2021, in responding to the Cybersecurity Incident, Defendant acknowledged the potential exposure of sensitive employee PII, as follows:

> Regarding data exfiltration - our investigation is still ongoing and we are working diligently with cybersecurity experts to determine whether and to what extent sensitive customer or employee data has been compromised. As is typical in ransomware incidents, it may take several more weeks or more to fully determine whether a specific customer's sensitive data (and what kind of data) may have been compromised. *If* we learn that sensitive customer business data and/or employee data (PII) was exposed because of this attack, **we will meet any obligations we have to inform affected customers and take appropriate steps to protect affected individuals**.[6]

12.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties to those individuals.

13.    The exposed PII of employees of Defendant's customers can be sold on the dark web.  Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals.

---

[4] Exhibit C at 18 (emphasis in original), *available at* https://www.ukg.com/KPCupdates/Archive (last visited Jan. 6, 2022).

[5] *Id.* at 9.

[6] *Id.* at 8 (emphasis in original).

3

Employees of Defendant's customers face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers.

14.     This PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect PII of employees of Defendant's customers.

15.     Until notified of the breach, Plaintiffs and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.  The risk will remain for their respective lifetimes.

16.     Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of employees of Defendant's customers; (ii) warn employees of Defendant's customers of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

17.     Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Cybersecurity Incident, including but not limited to lost time, and significantly (iv) the continued and certainly an increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as

Defendant fails to undertake appropriate and adequate measures to protect the PII, and at the very least, are entitled to nominal damages .

18.     Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that the PII of employees of Defendant's customers was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As the result, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

19.     Plaintiff Abiezer Fraga is a citizen of Florida residing in Dade County, Florida.  On or around December 13, 2021, Plaintiff Fraga learned of the Cybersecurity Incident.

20.     Plaintiff Charles Williams is a citizen of New York residing in New York, New York. On or around January 24, 2022, Plaintiff Williams learned of the Cybersecurity Incident.

21.     Defendant UKG Inc. is a corporation organized under the laws of Delaware, headquartered at 2000 Ultimate Way, Weston, FL, with its principal place of business in Weston, FL.

22.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs.  Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

23.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III. JURISDICTION AND VENUE

24.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one other Class Member is a citizen of a state different from Defendant to establish minimal diversity.

25.     The Middle District of Florida has personal jurisdiction over Defendant because Defendant is headquartered in this District and Defendant conducts substantial business in Florida and this District through its headquarters, offices, parents, and affiliates.

26.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### *Background*

27.     Defendant, among other things, provides software and services to help employers manage employee schedules, track employee time and attendance, administer employee absence and leave, and measure employee productivity.

28.     Plaintiffs and Class Members entrusted Defendant with some of their most sensitive and confidential information, including names, mailing addresses, email addresses, and/or Social Security numbers.  This includes information that is static, does not change, and can be used to commit myriad financial crimes.

29.     Plaintiffs and Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.  Employees of Defendant's customers demand security to safeguard their PII.

30.     Defendant had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties.

### The Cybersecurity Incident

31.     Prior to the Cybersecurity Incident, Defendant posted a "Privacy Policy" on its website (the "Privacy Policy").

32.     Under "Scope," the Private Policy states that it applies to "[Personal Information] provided or collected through the use of UKG's Services by customers, employees, job applicants, and/or website visitors." [7]

33.     Under "Sources of Personal Information," the Privacy Policy states, regarding "Customers' Information (and the Information of Their Employees and Job Applicants)," that "[t]he [Personal Information] processed by UKG on behalf of our customers varies, but includes information such as name, company name, address, email address, time and attendance and schedule information, and Social Security Numbers."[8]

34.     Under "Security," the Private Policy states as follows:

> To prevent unauthorized access or disclosure, to maintain data accuracy, and to allow only the appropriate use of your PI, UKG utilizes physical, technical, and administrative controls and procedures to safeguard the information we collect.

---

[7] Exhibit D, *available at* https://www.ukg.com/privacy#4243725865-1205368992 (last visited Jan. 6, 2022).

[8] Exhibit E, *available at* https://www.ukg.com/privacy#4243725865-2904399881 (last visited Jan. 6, 2022).

> To protect the confidentiality, integrity, availability and resilience of your PI, we utilize a variety of physical and logical access controls, firewalls, intrusion detection/prevention systems, network and database monitoring, anti-virus, and backup systems. We use encrypted sessions when collecting or transferring sensitive data through our websites.
>
> We limit access to your PI and data to those persons who have a specific business purpose for maintaining and processing such information. Our employees who have been granted access to your PI are made aware of their responsibilities to protect the confidentiality, integrity, and availability of that information and have been provided training and instruction on how to do so.[9]

35.     Prior to the Cybersecurity Incident, Defendant should have (i) encrypted or tokenized the sensitive PII of Plaintiffs and Class Members, (ii) deleted such PII that it no longer had a reasonable business need to maintain, (iii) eliminated the potential for unauthorized access to the PII from the Internet, and (iv) otherwise reviewed and improved the security of its systems that stored or governed access to the PII, including the Kronos Private Cloud.

36.     Prior to the Cybersecurity Incident, Defendant did not (i) encrypt or tokenize the sensitive PII of Plaintiffs and Class Members, (ii) delete such PII that it no longer had a reasonable business need to maintain, (iii) eliminate the potential for unauthorized access to the PII from the Internet, and (iv) otherwise review and improve the security of its systems that stored or governed access to the PII, including the Kronos Private Cloud.

37.     On or around December 13, 2021, Defendant posted the Website Notice.  The Website Notice provided, in part, as follows:

> We are reaching out to inform you of a cyber security incident that has disrupted the Kronos Private Cloud.
>
> As we previously communicated, late on Saturday, December 11, 2021, we became aware of unusual activity impacting UKG solutions using Kronos Private Cloud. We took immediate action to

---

[9] Exhibit F, *available at* https://www.ukg.com/privacy#4243725865-507775231 (last visited Jan. 6, 2022).

investigate and mitigate the issue, and have determined that this is a ransomware incident affecting the Kronos Private Cloud—the portion of our business where UKG Workforce Central, UKG TeleStaff, Healthcare Extensions, and Banking Scheduling Solutions are deployed. At this time, we are not aware of an impact to UKG Pro, UKG Ready, UKG Dimensions, or any other UKG products or solutions, which are housed in separate environments and not in the Kronos Private Cloud.

We are working with leading cyber security experts to assess and resolve the situation, and have notified the authorities. The investigation remains ongoing, as we work to determine the nature and scope of the incident.

While we are working diligently, our Kronos Private Cloud solutions are currently unavailable. Given that it may take up to several weeks to restore system availability, we strongly recommend that you evaluate and implement alternative business continuity protocols related to the affected UKG solutions. Support is available via our UKG Kronos Community and via our UKG Customer Support Team to provide input on your business continuity plans.

We deeply regret the impact this is having on you, and we are continuing to take all appropriate actions to remediate the situation. We recognize the seriousness of this issue and will provide another update within the next 24 hours.

Thank you for your support and partnership.[10]

38.     On or around December 28, 2021, Defendant admitted that it had not yet "determine[d] whether and to what extent sensitive customer or employee data has been compromised."[11]

39.     Plaintiffs' and Class Members' unencrypted information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted

---

[10] Exhibit A at 1.

[11] Exhibit C at 8.

marketing without the approval of the affected employees of Defendant's customers. Unauthorized individuals can easily access the PII of employees of Defendant's customers

40.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining employees of Defendant's customers, causing the exposure of PII for employees of thousands of employers.

41.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[12]

42.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Cybersecurity Incident, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

---

[12] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Jan. 6, 2022).

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[13]

43.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Cybersecurity Incident, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

---

[13] *Id.* at 3-4.

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[14]

44.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Cybersecurity Incident, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

---

[14] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Jan. 6, 2022).

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[15]

45.     Given that Defendant was storing the PII of employees of thousands of companies, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

46.     The occurrence of the Cybersecurity Incident indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Cybersecurity Incident and the exposure of the PII of employees of thousands of companies, including Plaintiffs and Class Members.

---

[15] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Mar. 15, 2021).

*Defendant Acquires, Collects and Stores Plaintiffs' and Class Members' PII.*

47.     Defendant acquired, collected, and stored the PII of employees of thousands of Defendant's customers.

48.     As a condition of providing workforce management services to its customers, Defendant requires that the customers' employees entrust Defendant with highly confidential PII.

49.     By obtaining, collecting, and storing Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

50.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII.  Plaintiffs and Class Members, as employees of Defendant's customers, relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

*Securing PII and Preventing Breaches*

51.     Defendant could have prevented this Cybersecurity Incident by properly securing and encrypting Plaintiffs' and Class Members' PII, or Defendant could have destroyed the data, especially old data from former employees that Defendant had no legal right to retain.

52.     Defendant's negligence in safeguarding the PII of employees of Defendant's customers is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

53.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

14

54.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[16] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

55.     The ramifications of Defendant's failure to keep secure the PII of employees of Defendant's customers are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### Value of Personal Identifiable Information and Protected Health Information

56.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[18] Experian reports that a stolen credit or debit

---

[16] 17 C.F.R. § 248.201 (2013).

[17] *Id*.

[18] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Jan. 6, 2022).

card number can sell for $5 to $110 on the dark web.[19] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20]

57.     Social Security numbers, for example, are among the most sensitive kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[21]

58.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[19] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*:  https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last visited Jan. 6, 2022).

[20] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Jan. 6, 2022).

[21] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 6, 2022).

59.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[22]

60.     Based on the foregoing, the information compromised in the Cybersecurity Incident is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Cybersecurity Incident is impossible to "close" and difficult, if not impossible, to change—names, mailing addresses, email addresses, and/or Social Security numbers.

61.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[23]

62.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

63.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[22] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Jan. 6, 2022).

[23] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Jan. 6, 2022).

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

64.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of employees of Defendant's customers, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on employees of Defendant's customers as a result of a breach.

65.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

66.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially thousands of individuals' detailed, personal information and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

67.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of employees of Defendant's customers.

### Plaintiff Fraga's Experience

---

[24]  *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf (last accessed Jan. 6, 2022).

68.     For approximately a decade, Plaintiff Fraga has worked for a customer of Defendant.  In the course of his employment, he entrusted Defendant with his PII, including but not limited to his name, mailing address, email address, and Social Security number.

69.     On or around December 13, 2021, Plaintiff Fraga learned of the Cybersecurity Incident.

70.     As a result of learning of the Cybersecurity Incident, Plaintiff Fraga spent time dealing with the consequences of the Cybersecurity Incident, which includes time spent verifying the legitimacy of the announcement of the Cybersecurity Incident, exploring credit monitoring and identity theft insurance options, and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

71.     Additionally, Plaintiff Fraga is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

72.     Plaintiff Fraga stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

73.     Plaintiff Fraga suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Fraga entrusted to Defendant for the purpose of his employment, which was compromised in and as a result of the Cybersecurity Incident.

74.     Plaintiff Fraga suffered lost time, annoyance, interference, and inconvenience as a result of the Cybersecurity Incident and has anxiety and increased concerns for the loss of his privacy.

75.    Plaintiff Fraga has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name, being placed in the hands of unauthorized third-parties and possibly criminals.

76.    Plaintiff Fraga has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Williams' Experience*

77.    Plaintiff Williams has worked for a customer of Defendant.  In the course of his employment, he entrusted Defendant with his PII, including but not limited to his name, mailing address, email address, and Social Security number.

78.    On or around January 24, 2022, Plaintiff Williams learned of the Cybersecurity Incident.

79.    As a result of learning of the Cybersecurity Incident, Plaintiff Williams spent time dealing with the consequences of the Cybersecurity Incident, which includes time spent verifying the legitimacy of the announcement of the Cybersecurity Incident, exploring credit monitoring and identity theft insurance options, and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

80.    Additionally, Plaintiff Williams is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

81.    Plaintiff Williams stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

82.     Plaintiff Williams suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Williams entrusted to Defendant for the purpose of his employment, which was compromised in and as a result of the Cybersecurity Incident.

83.     Plaintiff Williams suffered lost time, annoyance, interference, and inconvenience as a result of the Cybersecurity Incident and has anxiety and increased concerns for the loss of his privacy.

84.     Plaintiff Williams has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name, being placed in the hands of unauthorized third-parties and possibly criminals.

85.     Plaintiff Williams has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

86.     Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

87.     The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals whose PII was accessed or potentially accessed during the cybersecurity incident referenced in the Website Notice (the "Nationwide Class").

88.     Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

89.     Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

90.     <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1): The Nationwide Class (the "Class") is so numerous that joinder of all members is impracticable.   On December 28, 2021, Defendant confirmed that employees of thousands of companies were affected or potentially affected by the Cybersecurity Incident.  In any event the exact numbers of members in the Class can be ascertained through Defendant's records.

91.     <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

    a.  Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

    b.  Whether Defendant had a duty to not disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

    c.  Whether Defendant had a duty to not use the PII of Plaintiffs and Class Members for non-business purposes;

22

d.  Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

e.  Whether and when Defendant actually learned of the Cybersecurity Incident;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been actually or potentially compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been actually or potentially compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Cybersecurity Incident;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Cybersecurity Incident to occur;

j.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Cybersecurity Incident.

92.  Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Cybersecurity Incident, due to Defendant's misfeasance.

93.  Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect

23

to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

94.     Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class.  Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members.  Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

95.     Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

96.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would

necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

97.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

98.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

99.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members and Defendant may continue to act unlawfully as set forth in this Complaint.

100.    Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

101.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

     a.  Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

     b.  Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

     c.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

     d.  Whether a contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that contract;

     e.  Whether Defendant breached the contract;

     f.  Whether Defendant adequately, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

     g.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Cybersecurity Incident;

     h.  Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

## <u>COUNT I</u>
### Negligence
### (On Behalf of Plaintiffs and the Nationwide Class)

102.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 101.

103.   As a condition of their employment, employees of thousands of Defendant's customers provided and entrusted Defendant with certain PII, including their names, mailing addresses, email addresses, and/or Social Security numbers.

104.   Plaintiffs and the Nationwide Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

105.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Nationwide Class could and would suffer if the PII were wrongfully disclosed.

106.   Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using the PII of employees of Defendant's customers involved an unreasonable risk of harm to Plaintiffs and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

107.   Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and the Nationwide Class's information in Defendant's possession was adequately secured and protected.

108.   Defendant also had a duty to exercise appropriate clearinghouse practices to remove the PII of employees of Defendant's customers it was no longer required to retain pursuant to regulations.

109.   Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and the Nationwide Class's PII.

110.     Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Nationwide Class.  That special relationship arose because Plaintiffs and the Nationwide Class entrusted Defendant with their confidential PII, a necessary part of obtaining employment with Defendant's customers.

111.     Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs and the Nationwide Class.

112.     A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Nationwide Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

113.     Plaintiffs and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

114.     Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Nationwide Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Cybersecurity Incident as set forth herein. Defendant's misconduct also included its decision not to comply with industry standards for the safekeeping of Plaintiffs' and the Nationwide Class's PII, including basic encryption techniques freely available to Defendant.

115.     Plaintiffs and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

116.     Defendant was in a position to protect against the harm suffered by Plaintiffs and the Nationwide Class as a result of the Cybersecurity Incident.

117.     Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Nationwide Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Nationwide Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

118.     Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Nationwide Class.

119.     Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Nationwide Class during the time the PII was within Defendant's possession or control.

120.     Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Nationwide Class in deviation of standard industry rules, regulations, and practices at the time of the Cybersecurity Incident.

121.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of employees of Defendant's customers in the face of increased risk of theft.

122.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of the PII of employees of Defendant's customers.

123. Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove the PII of employees of Defendant's customers it was no longer required to retain pursuant to regulations.

124. Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Nationwide Class the existence and scope of the Cybersecurity Incident.

125. But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, the PII of Plaintiffs and the Nationwide Class would not have been compromised.

126. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Nationwide Class and the harm suffered or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs' and the Nationwide Class's PII was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

127. Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

128. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained

and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Nationwide Class.

129.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

130.    Plaintiffs and the Nationwide Class are within the class of persons that the FTC Act was intended to protect.

131.    The harm that occurred as a result of the Cybersecurity Incident is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

132.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Cybersecurity Incident, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of employees of Defendant's customers in its continued possession; and (viii) present and future costs in terms of time, effort, and money that will be

expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Cybersecurity Incident for the remainder of the lives of Plaintiffs and the Nationwide Class.

133.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

134.    Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

135.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs are at an increased risk of identity theft or fraud.

136.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs are entitled to and demand actual consequential, and nominal damages and injunctive relief.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

137.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 101.

138.    Defendant acquired and maintained the PII of Plaintiffs and the Nationwide Class, including names, mailing addresses, email addresses, and/or Social Security numbers.

139.     At the time Defendant acquired the PII and PII of Plaintiffs and the Nationwide Class, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the PII and not take unjustified risks when storing the PII.

140.     Plaintiffs and the Nationwide Class would not have entrusted their PII to Defendant had they known that Defendant would make the PII potentially accessible to unauthorized persons via the Internet, not encrypt sensitive data elements such as Social Security numbers, and not delete the PII that Defendant no longer had a reasonable need to maintain.

141.     Prior to the Cybersecurity Incident, Defendant published the Privacy Policy, agreeing to safeguard the PII of Plaintiff and the Nationwide Class.

142.     In collecting and maintaining the PII of Plaintiffs and the Nationwide Class and publishing the Privacy Notice, Defendant entered into contracts with Plaintiffs and the Nationwide Class requiring Defendant to safeguard the PII of employees of Defendant's customers.

143.     Plaintiffs and the Nationwide Class fully performed their obligations under the contracts with Defendant.

144.     Defendant breached the contracts it made with Plaintiffs and the Nationwide Class by failing to safeguard the PII of Plaintiffs and the Nationwide Class, including failing to (i) encrypt or tokenize the sensitive PII of Plaintiffs and the Nationwide Class, (ii) delete such PII that it no longer had reason to maintain, (iii) eliminate the potential for unauthorized access to the PII from the Internet, and (iv) otherwise review and improve the security of its systems that contained such PII, including the Kronos Private Cloud.

145.     As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Nationwide Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and

economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

146.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs are at an increased risk of identity theft or fraud.

147.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs are entitled to and demand actual, consequential, and nominal damages and injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Nationwide Class as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and the Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.   requiring Defendant to protect, including through encryption, all employee data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.   requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiffs' and Class Members' personal identifying information;

v.   prohibiting Defendant from maintaining Plaintiffs' and Class Members' personal identifying information on a cloud-based database;

vi.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.   requiring Defendant to conduct regular database scanning and securing checks;

xi.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor

36

        Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

    xv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

   xvi.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

Date: February 17, 2022                    Respectfully Submitted,

/s/ John A. Yanchunis
JOHN A. YANCHUNIS
RYAN D. MAXEY
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505
jyanchunis@ForThePeople.com
rmaxey@ForThePeople.com

Gary M. Klinger (*pro hac vice forthcoming*)
**MASON LIETZ & KLINGER, LLP**
221 W. Monroe Street, Suite 2100
Chicago, IL 60606
(202) 975-0477
gklinger@masonllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2022, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing

to all counsel of record.

/s/ John A. Yanchunis