**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-20105-CIV-ALTONAGA/Torres**

**ABIEZER FRAGA**, *et al.*,

      Plaintiffs,

v.

**UKG, INC.**,

      Defendant.

_____/

**<u>ORDER</u>**

**THIS CAUSE** is before the Court on Defendant, UKG, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint [ECF No. 31], filed on March 25, 2022.  Plaintiffs, Abiezer Fraga, Charles Williams, and Christian Cavazos, filed a Response [ECF No. 38], to which Defendant filed a Reply [ECF No. 39].  The Court has carefully reviewed the Second Amended Class Action Complaint ("SAC") [ECF No. 30], the parties' written submissions, and applicable law.

**I.  BACKGROUND**

This case involves an increasingly common pattern of events: an alleged mass data breach occurs, individuals whose sensitive personal information might have been compromised sue the custodian of that information in federal court, and the custodian challenges the plaintiffs' standing to sue.[1]  And the result in this case, like the results in previous cases much like it, turns on the application of bedrock constitutional principles to Plaintiffs' allegations of actualized and potential injury.  Those allegations tell the following story.

---

[1] *See McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 300–03 (2d Cir. 2021) (collecting cases); *Beck v. McDonald*, 848 F.3d 262, 273–74 (4th Cir. 2017) (same).

Defendant sells digital applications that help companies manage and pay their employees. (*See* SAC ¶¶ 3–4, 29). In particular, companies can manage employees' schedules, track employees' time and attendance, and measure productivity through Defendant's "Workforce Central" application. (*Id.* ¶ 4). Employers that use Defendant's products give Defendant their employees' personally identifiable information, or PII, which Defendant stores in computer hardware in its "Kronos Private Cloud." (*Id.* ¶ 5). The PII stored by Defendant includes sensitive information often misappropriated by identity thieves — names, mailing addresses, email addresses, and Social Security numbers. (*See id.* ¶¶ 1, 9, 30, 58–66).

In December 2021, an unknown third party launched a ransomware attack against Defendant. (*See id.* ¶ 6). The attacker obtained unauthorized access to the Kronos Private Cloud and, according to Plaintiff, "may have accessed the PII of employees of Defendant's customers, including Plaintiff[s] and Class Members." (*Id.* ¶ 7 (alteration added); *see id.* ¶ 6). A few days later, the City of Cleveland advised the public that "some of the data accessed may have included some employees' first and last names, addresses, last four of the SSN, and employee ID." (*Id.* ¶ 9 (alteration adopted; quotation marks and footnote call number omitted)). Defendant communicated a similar message. Shortly after the attack, Defendant posted on its website that it had launched an investigation and was "working diligently to determine if customer data ha[d] been compromised." (*Id.* ¶ 10 (alteration added; footnote call number omitted)).

Weeks passed. In that time, Defendant continued to emphasize that its investigation was not complete. It maintained that "each customer's environment needs to be addressed individually" and "it may take several more weeks or more to fully determine whether a specific customer's sensitive data (and what kind of data) may have been compromised." (*Id.* ¶¶ 11–12 (quotation marks and footnote call number omitted)). Defendant committed to informing any

affected customers and taking remedial measures in the event it determined those customers' PII had been accessed.  (*See id.* ¶ 12).

Plaintiffs are employees of Defendant's customers.  (*See id.* ¶¶ 70, 79, 88).  They allege Defendant is liable to them for harm resulting from the breach because Defendant did not take adequate measures to safeguard their PII.  (*See, e.g.*, *id.* ¶¶ 14, 37–38, 42–48, 53–56).  According to Plaintiffs, Defendant's ineffective protection of their PII fell short of industry standards, violated federal regulations and Defendant's own policies, and ignored various forms of commonsense cybersecurity guidance issued by the government and others.  (*See, e.g.*, *id.* ¶¶ 19, 33–38, 42–48, 58–66, 133).  One such piece of guidance is a 2007 Report of the U.S. Government Accountability Office (GAO) that addressed risks related to data breaches.  (*See id.* ¶ 65 & n.22).

Plaintiffs sue on behalf of two putative classes.  The first proposed class, which Fraga and Williams seek to represent, includes persons "whose PII was accessed or potentially accessed during the [data breach.]"  (*Id.* ¶ 100 (alteration added)).  Fraga and Williams assert two claims, one for negligence (Count I), and one for breach of implied contract (Count II).  (*See id.* ¶¶ 116–61).  They allege that after the data breach, they spent time mitigating the risk that their PII would be misappropriated, suffered diminished value to their PII (which they claim is "a form of intangible property"), experienced "annoyance" and "anxiety" because of the breach, and are at a "substantially increased risk" of having their PII misused by third parties or criminals.  (*Id.* ¶¶ 75–77, 84–86; *see id.* ¶¶ 72, 81).  They further allege that a robust black market for PII exists, as criminals are willing to pay high prices for individuals' PII on the dark web.  (*See id.* ¶ 58).

The second proposed class, which Cavazos hopes to represent, encompasses individuals "whose wages were untimely paid as a result of the [data breach]."  (*Id.* ¶ 101 (alteration added)).  Cavazos has not received his full wages since December 2020, allegedly "[a]s a result" of the

breach in December 2021.[2] (*Id.* ¶ 89 (alteration added)). Cavazos sues for negligence (Count III) and breach of contract (Count IV), asserting the latter claim on the theory that he is a third-party beneficiary of a contract between Defendant and his employer, Pepsico. (*See id.* ¶¶ 22, 162–75). Cavazos insists that he is also at a substantially increased risk of identity theft, has suffered as a result of a decrease in the value of his PII, and has taken mitigative measures to protect his identity. (*See id.* ¶¶ 92, 95–97).

Defendant moves to dismiss the Second Amended Complaint due to Plaintiffs' lack of standing and failure to state plausible claims for relief. This Order only examines the first ground for dismissal.

## II.  LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) permits defendants to move to dismiss a pleading for a lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). When a defendant files a Rule 12(b)(1) motion, the plaintiff, as the party invoking the authority of a federal court to seek relief, bears the burden of establishing federal subject-matter jurisdiction. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). Challenges to a plaintiff's standing to sue under Article III of the Constitution are attacks on federal subject-matter jurisdiction; thus, they fall under Rule 12(b)(1). *See Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (citation omitted).

"A defendant can move to dismiss a complaint under Rule 12(b)(1) by either facial or factual attack." *Id.* (citation omitted). District courts confronted with a factual challenge under Rule 12(b)(1) "may consider extrinsic evidence such as deposition testimony and affidavits."

---

[2] The Court assumes that the SAC's reference to "December of 2020" is a scrivener's error. If it were not, that would mean Cavazos's employer neglected to pay him for an entire year before the ransomware attack occurred, and thus, the SAC would fail to plausibly allege that Cavazos's nonreceipt of his wages is fairly traceable to the attack.

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) (citation omitted).  Not so when the challenge is facial.  "Facial challenges to subject matter jurisdiction are based solely on the allegations in the complaint.  When considering such challenges, the court must, as with a Rule 12(b)(6) motion, take the complaint's allegations as true."  *Id.* (citation omitted).

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (alteration added; citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

The "plausibility" pleading requirement of Rule 12(b)(6) also applies to allegations in support of subject-matter jurisdiction.  *See Brownback v. King*, 141 S. Ct. 740, 749 n.8 (2021); *see also Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924–25 (11th Cir. 2020) (en banc).  When the challenge is directed to the plaintiff's standing under Article III, the plaintiff "bears the burden" of establishing each element of Article III standing "by alleging facts that 'plausibly' demonstrate each element."  *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337 (11th Cir. 2021) (citation omitted); *see also Spokeo*, 578 U.S. at 338 (holding the plaintiff must "clearly allege facts demonstrating each element" (alteration adopted; citation, quotation marks, and footnote call number omitted)).  In a putative class action, the "named plaintiffs who represent a

class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo*, 578 U.S. at 338 n.6 (citation and quotation marks omitted).

### III. DISCUSSION

Defendant argues that the SAC should be dismissed because (1) Plaintiffs do not plausibly allege facts that establish their Article III standing to sue, and (2) Plaintiffs fail to state claims on which relief can be granted. (*See* Mot. 9–26).[3]  Standing is an issue of subject-matter jurisdiction, so the Court must consider it before evaluating the merits of Plaintiffs' claims, should such evaluation be necessary. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998).

Article III of the United States Constitution vests "[t]he judicial Power of the United States . . . in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1 (alterations added).  Section 2 of Article III defines the scope of "[t]he judicial power of the United States[.]" *Id.* (alterations added); *see id.* § 2.  That power "shall extend" only to "cases" and "controversies" of the types enumerated in section 2. *Id.* § 2.  This limit on the judiciary's Article III power is integral to the Constitution's separation-of-powers structure.

In fact, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (alteration added; citation and quotation marks omitted).  And "[t]o satisfy the 'case' or 'controversy' requirement, a plaintiff in a matter must have standing to sue." *Tsao*, 986 F.3d at

---

[3] The Court relies on the pagination generated by the Case Management/Electronic Case Files system, which appears as a header on all filings.

1337 (alteration added; citation omitted).

Standing involves three elements.  To sue in federal court, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citation and quotation marks omitted).  The injury that a plaintiff must initially allege — and eventually show — has to be "concrete, particularized, and actual or imminent, rather than conjectural or hypothetical." *Muransky*, 979 F.3d at 925 (citation and footnote call number omitted).  "A plaintiff at the pleading stage . . . bears the burden of establishing these elements by alleging facts that 'plausibly' demonstrate each element." *Tsao*, 986 F.3d at 1337 (alteration added; citation omitted).

Plaintiffs make four arguments that they have plausibly alleged standing.[4]  Each one fails.

## A.  Future Injury

*First*, Plaintiffs argue that the data breach puts them at a substantial and imminent risk of identity theft and misuse of their PII.  (*See* Resp. 7–13).  This argument, in other words, asserts that Plaintiffs are at risk of *future* harm.  The Court does not write on a blank slate here, so a review of some elemental standing precedents is in order.

In *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), the Supreme Court considered whether the respondents, certain attorneys and media organizations, had standing to challenge the constitutionality of a federal statute that authorized the surveillance of foreign individuals for intelligence gathering purposes.  *See id.* at 406–07.  Because the respondents communicated with individuals who were likely targets of surveillance, they argued they had standing because there was an objectively reasonable likelihood that their communications would

---

[4] In their Response, Plaintiffs disclaim reliance on allegations that they suffered mental anxiety and distress to establish standing, calling them "damages allegation[s], not . . . injury allegation[s]." (Resp. 15 (alterations added; citation omitted)).  Thus, the Court does not consider these allegations in its standing analysis.

be surveilled.  *See id.* at 410.

The Supreme Court disagreed.  It stressed it had "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute an injury in fact,' and that 'allegations of *possible* future injury' are not sufficient."  *Id.* at 409 (emphasis in original; alteration adopted; citations omitted).  For these reasons, the respondents' preferred "objectively reasonable likelihood" test was "inconsistent with [the] requirement that 'threatened injury must be certainly impending to constitute injury in fact.'"  *Id.* at 410 (alteration added; citations and quotation marks omitted).  Having offered a theory of standing supported by only a "chain of contingencies" at the summary judgment stage, the respondents essentially asked the Court to "merely speculate and make assumptions about whether their communications with their foreign contacts w[ould] be acquired[.]"  *Id.* at 410–11 (alterations added; citation omitted).  That "speculative chain of possibilities" was not enough to clear Article III's "case" or "controversy" threshold.  *Id.* at 414 (footnote call number omitted).

A few years later, the Supreme Court decided *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).  The plaintiffs in that case brought a class action alleging that the defendant failed to use reasonable procedures to ensure the accuracy of their credit files.  *See id.* at 2200.  Several thousand members of the class faced an obstacle, however: the defendant had never provided their credit files to a third party, and therefore, any misleading information in the files had not yet harmed their reputations.  *See id.*  The Court held that any harm resulting from inaccurate information in an undisclosed credit file was not concrete.  *See id.* at 2210.

Undeterred, these class members made "a separate argument based on an asserted *risk of future harm*."  *Id.*  (emphasis in original).  They maintained that inaccurate information in their (undisclosed) credit files "exposed them to a material risk that the information would be

disseminated in the future to third parties and thereby cause them harm." *Id.* The Court rejected this argument as well, calling it "too speculative to support Article III standing." *Id.* at 2212 (citations omitted). Reviewing trial evidence, the Court concluded "the plaintiffs did not demonstrate a sufficient likelihood that their individual credit information" would be requested by, or released to, third parties. *Id.*

Recent cases from the Eleventh Circuit chart much the same path. In *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, the Eleventh Circuit, sitting *en banc*, considered whether the plaintiff in a putative class action had standing to pursue claims for an alleged violation of a federal statute that prohibited merchants from printing more than the last five digits of their customers' credit card numbers on receipts. *See id.* at 921–22. Among the plaintiff's allegations that standing existed was his assertion that the defendant's violation of federal law placed him at an elevated risk of identity theft. *See id.* at 922. Noting the plaintiff's allegation of future injury, the court emphasized that "while very nearly any level of direct injury is sufficient to show concrete harm, the risk-of-harm analysis entails a more demanding standard — courts are charged with considering the magnitude of the risk." *Id.* at 927.

How may the Court do so? *Muransky*'s answer is that a plaintiff's risk of harm must be "material" to establish Article III standing. *Id.* (quotation marks omitted; quoting *Spokeo*, 578 U.S. at 342). Acknowledging that this "familiar word" is less than precise in the standing context, the *Muransky* court offered several elaborations. *Id.* (citations omitted). "Material" means something more than "conceivable and trifling[.]" *Id.* (alteration added). It also means "something more than a minor or theoretical risk[.]" *Id.* (alteration added; citation omitted). To be material, the risk must be "substantial" — or at least something akin to "substantial[.]" *Id.* (alteration added; citation and quotation marks omitted).

Whatever the precise formulation, *Muransky* endorsed a long line of decisions "recognizing a high standard for the risk-of-harm analysis, and a robust judicial role in assessing that risk." *Id.* (collecting cases). At the pleading stage, this means that just as "[a] conclusory statement that a . . . violation caused an injury is not enough . . . a conclusory statement that a . . . violation caused a risk of injury" is likewise insufficient. *Id.* at 928 (alterations added).

The *en banc* court then applied these principles to the plaintiff's allegations of future injury, ultimately rejecting as inadequate his "threadbare allegation that he was exposed to an increased risk of identity theft." *Id.* at 933. That allegation was not enough, the court explained, because "[n]othing" in the complaint "indicate[d] how much this risk might [have been] . . . and no facts alleged in the complaint provide[d] insight into what degree of 'elevated risk' [the plaintiff] faced, or why." *Id.* (alterations added). Thus, the plaintiff failed to "plead facts that, taken as true, plausibly allege[d] a material risk, or significant risk, or substantial risk, or anything approaching a realistic danger." *Id.* (alteration added; citing *Iqbal*, 556 U.S. at 678–79).

A year later, the Eleventh Circuit decided *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332. There, the plaintiff sued a restaurant after hackers gained access to the restaurant's point of sale system, which contained its customers' credit and debit card information. *See id.* at 1335. The restaurant announced on its website after the attack that while the cyber-attack affected all its locations, it had not yet determined the number of credit card numbers or names that the hackers accessed. *See id.* The plaintiff asserted several common law claims against the restaurant, including negligence and breach of implied contract. *See id.* at 1336. He predicated his standing to sue in part on allegations that he faced "a substantial risk of identity theft, fraud, and other harm in the future as a result of the breach[,]" *id.* at 1340 (alteration added; quotation marks omitted), and that putative class members had suffered "unauthorized charges" on their credit cards, *id.* at

1335 (quotation marks omitted).

*Tsao* reiterated the principles that *Muransky* announced.  The court stated that "a plaintiff alleging a threat of harm does not have Article III standing unless the hypothetical harm is either 'certainly impending' or there is a 'substantial risk' of such harm."  *Id.* at 1339 & n.2 (citations omitted).  It also repeated that "threadbare allegations of 'increased risk' are insufficient to confer standing."  *Id.* at 1343.  But the *Tsao* court stopped short of holding that a plaintiff must show "evidence of actual misuse" of PII following a data breach.  *Id.* at 1343–44 (citation omitted).  Instead, it explained that "without specific evidence of *some* misuse of class members' data, a named plaintiff's burden to plausibly plead factual allegations sufficient to show that the threatened harm of future identity theft was 'certainly impending' — or that there was a 'substantial risk' of such harm — will be difficult to meet."  *Id.* (citation omitted).

In combination, application of these principles required dismissal, the court reasoned, because the plaintiff offered only conclusory allegations that he faced an increased risk of identity theft and that class members had suffered unauthorized charges on their cards.  *See id.* at 1344.  Those allegations did not plausibly imply that the plaintiff faced "a 'substantial risk' of future identity theft or identity theft was 'certainly impending.'"  *Id.* (quoting *Clapper*, 568 U.S. at 409).

Then came *In re Equifax Inc. Customer Data Security Breach Litigation*, 999 F.3d 1247 (11th Cir. 2021).  In *Equifax*, the Eleventh Circuit considered whether class members had standing to sue for a data breach that affected the PII of nearly 150 million Americans.  *See id.* at 1256–57.  Drawing on *Muransky* and *Tsao*, the court concluded the class members had "easily shown injury in fact" because the plaintiffs alleged that "hackers obtained at least 146.6 million names, 146.6 million dates of birth, 145.5 million Social Security numbers, 99 million addresses, 17.6 million driver's license numbers, 209,000 credit card numbers, and 97,500 tax identification numbers."

*Id.* at 1262 (quotation marks omitted).  Moreover, "dozens" of the plaintiffs alleged they had already had their identities stolen and incurred related injuries, including unauthorized charges on their credit cards, accounts made in their name, and an impaired ability to take out loans.  *Id.* at 1262–63.

All told, the "colossal amount of sensitive data stolen" in *Equifax* supported the plaintiffs' allegations that they were at a material risk of having their identities stolen, even though some plaintiffs did not allege that their PII had been stolen or misused.  *Id.* at 1262 (citations omitted).  As the Eleventh Circuit put it, "the allegations of some Plaintiffs that they have suffered injuries resulting from <u>actual</u> identity theft support the sufficiency of all Plaintiffs' allegations that they face a <u>risk</u> of identity theft."  *Id.* at 1263.

Each of these cases was decided in a unique factual and procedural context.  *Clapper* and *TransUnion* considered the plaintiffs' standing at summary judgment and after trial, respectively.  *See* 568 U.S. at 407; 141 S. Ct. at 2202.  By contrast, *Muransky*, *Tsao*, and *Equifax* grappled with the sufficiency of the pleadings.  *See* 979 F.3d at 933–34; 986 F.3d at 1343–44; 999 F.3d at 1261–63.  *Clapper*, *TransUnion*, and *Muransky* each touched on Congress's role in creating or defining injuries that satisfy Article III, *see* 568 U.S. at 421; 141 S. Ct. at 2204–07; 979 F.3d at 925–28; while *Tsao* addressed the plaintiff's standing to pursue state common law claims, *see* 986 F.3d at 1336.  Recognizing these differences, some common threads can be unwound.

One is that plausibly alleging a risk of future injury adequate to give rise to Article III standing is a "demanding" task.  *Muransky*, 979 F.3d at 927.  Absent evidence or allegations of misuse, that burden "will be difficult to meet."  *Tsao*, 986 F.3d at 1344 (citation omitted).  Another is that courts must zealously police the line between "material risk[s] of harm[,]" *Muransky*, 979 F.3d at 927 (alterations added; citations and quotation marks omitted), that are "certainly

impending[,]" *Clapper*, 568 U.S. at 416 (alteration added); and harms that are "conjectural or hypothetical[,]" *Trichell*, 964 F.3d at 996 (alteration added; citation and quotation marks omitted). And alleging the existence of a "substantial risk" of future identity theft resulting from a data breach, without further detail or allegations of misuse, is not enough. *See Tsao*, 986 F.3d at 1343–44; *Muransky*, 979 F.3d at 928, 933.[5]

Now returning to this case. Plaintiffs' primary argument in support of their standing is "that the substantial risk of future harm — by virtue of a data breach alone — is enough to confer standing." (Resp. 8 (citation omitted)). The problem — and it most assuredly is a big one — is that the governing law just discussed says the opposite. In the Eleventh Circuit at least, "[e]vidence [or the allegation] of a mere data breach does not, standing alone, satisfy the requirements of Article III standing." *Tsao*, 986 F.3d at 1344 (alterations added).

In any event, Plaintiffs' allegations of future harm do not suffice. Plaintiffs do not allege that any misuse of class members' PII has occurred. Nor do Plaintiffs even allege their data has

---

[5] Plaintiffs cite several out-of-Circuit cases to support their arguments that they possess standing to sue for future harms. (*See* Resp. 8–11 (citations omitted)). *Tsao* discussed most of these cases, nevertheless recognizing that courts in the Eleventh Circuit "are not bound by any of the[m]." 986 F.3d at 1340 (alteration added). The *Tsao* court observed that its standing analysis was generally consistent with that of other circuits, with the possible exception of the Seventh Circuit. *See id.* at 1340–43.

Plaintiffs point to a Second Circuit case decided after *Tsao* — *McMorris v. Carlos Lopez & Associates, LLC*, 995 F.3d 295 — arguing that the Court should apply the three factors set out in *McMorris* to determine whether they have standing. (*See* Resp. 8–9). But *McMorris* is of no help to Plaintiffs for a few reasons. To start, *McMorris* repeatedly admonished that the three factors "are by no means the only ones relevant to determining whether plaintiffs have shown an injury in fact based on an increased risk of future identity theft" and that "none of these factors is alone necessary or sufficient to confer standing[.]" 995 F.3d at 301–02 (alteration added; citation omitted). The be-all-and-end-all of future harm analysis is whether the plaintiff has adequately shown a substantial risk of, or a certainly impending, future injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). *McMorris* and Eleventh Circuit law both account for that fact; indeed, *McMorris* based its discussion of the three factors on the same line of cases that *Tsao* catalogued. *Compare* 995 F.3d at 300–01 *with* 986 F.3d at 1340–43. Moreover, to the extent that *McMorris* conflicts with Eleventh Circuit law, the latter controls. *See Bodner v. Royal Caribbean Cruises, Ltd.*, No. 17-20260-Civ, 2018 WL 4047119, at \*4 (S.D. Fla. May 8, 2018); *see also* 11th Cir. R. 36, I.O.P. (2).

been accessed; they allege only that it "may" have been accessed.  (SAC ¶ 7; *see also id.* ¶¶ 9–12).

Plaintiffs' allegations of future injury thus depend on a "highly attenuated chain of possibilities,"

*Clapper*, 568 U.S. at 410 (citations omitted), and neither Article III nor federal pleading rules

permit the Court to fill in the blanks, *see Muransky*, 979 F.3d at 927–28.

Plaintiffs' remaining allegations of future harm — consisting of descriptive and hyperbolic

phrases such as Plaintiffs facing a "substantial[]" and "lifetime" risk of identity theft because of

the breach — merely pay lip service to the legal test for standing.  (SAC ¶¶ 14, 77, 86, 97 (alteration

added)).  Whatever adjectives Plaintiffs employ, their "threadbare" allegations do not nudge the

SAC across the jurisdictional line.  *Tsao*, 986 F.3d at 1343.  Article III requires more.

Plaintiffs attempt to rehabilitate the SAC's allegations of future injury by comparing them

to allegations in other, non-binding cases where the plaintiffs' data had "already been stolen and

[wa]s [] in the hands of ill-intentioned criminals."  (Resp. 9 (alterations added; quotation marks

omitted; quoting *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016))).

Allegations of theft might well be sufficient to invoke federal jurisdiction, *see In re Equifax*, 999

F.3d at 1262–63, but here, such allegations are hypothetical only.  The SAC does not allege that

theft of any kind has occurred.  (*See* SAC ¶¶ 7, 9–12).

Plaintiffs also suggest the presence of Social Security numbers within the PII that "may"

(or may not) have been accessed creates a substantial enough risk of future harm.  (*Id.* ¶ 7; *see also*

Resp. 10).  No doubt, Social Security numbers are sensitive, and are often used by identity thieves,

as Plaintiffs allege.  (*See* SAC ¶¶ 58–66).  But even assuming the presence of Social Security

numbers in the Cloud increases the risk of future identity theft, the SAC's allegations still miss the

mark.

Plaintiffs allege only that their Social Security numbers *may* have been accessed.  (*See id.*

¶¶ 7, 9–12).  They do not allege that their, or any class member's, PII was *in fact* accessed, let alone stolen, let alone misused.[6]  *See McMorris*, 995 F.3d at 304 (holding that even though sensitive PII, including Social Security numbers, was exposed to unauthorized individuals, standing did not exist "in the absence of any other facts suggesting that the PII was intentionally taken by an unauthorized third party or otherwise misused" (footnote call number omitted)); *see also Muransky*, 979 F.3d at 927 (holding that "the risk-of-harm analysis entails a . . . demanding standard" and "courts are charged with considering the magnitude of the risk" (alteration added)). Even when charitably read, Plaintiffs' allegations that their Social Security numbers "may" have been accessed amount, at most, to assertions of "conjectural" and "hypothetical" future injuries. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation and quotation marks omitted). Such allegations are not enough.

The Supreme Court's decision in *Doe v. Chao*, 540 U.S. 614 (2004), does not, as Plaintiffs suggest, require a different outcome.  (*See* Resp. 10 n.2).  In *Chao*, in violation of the Privacy Act, the Department of Labor disclosed the Social Security number of a claimant for federal benefits. *See* 540 U.S. at 616–17.  The Court held the claimant was not entitled to a statutory award because

---

[6] Plaintiffs endeavor to distinguish *Tsao* by arguing that the absence of Social Security numbers from the PII exposed in *Tsao* was critical to the Eleventh Circuit's holding that standing did not exist.  (*See* Resp. 10–12).  In *Tsao*, the court compared the facts before it to those of an Eighth Circuit case, *In re SuperValu, Inc.*, 870 F.3d 763 (8th Cir. 2017).  *See Tsao*, 986 F.3d at 1342–43.  In drawing that comparison, the court in *Tsao* indeed emphasized that, based on the 2007 GAO Report, the disclosure of Social Security numbers and drivers' license numbers increases the risk that PII will be misappropriated.  *See id.*  But the *Tsao* court was keen to point out that it would have reached the same result even if it had "set aside the GAO Report and the reasoning of *SuperValu*[.]"  *Id.* at 1343 (alteration added; citation omitted).

Thus, far from suggesting that "the result would likely have been different" if only Social Security numbers were implicated (Resp. 12), *Tsao* stands for the unremarkable principle that plaintiffs must allege more than speculative future harms, and — more to the point — that "[e]vidence of a mere data breach does not, standing alone, satisfy the requirements of Article III standing."  986 F.3d at 1344 (alteration added). Even if *Tsao* did not address breaches of data that included Social Security numbers, the constitutional principles that *Tsao* relied on do not sweep as narrowly as Plaintiffs contend.

he did not suffer actual damages. *See id.* at 627.

*Chao*'s standing analysis was sparse, at best. To be sure, the conclusion that the plaintiff had "[s]tanding to sue, but not to succeed," was implicit in *Chao*'s reasoning. *Id.* at 641 (Ginsburg, J., dissenting) (alteration added); *see also id.* at 624–25 (majority opinion). Attempting to make sense of *Chao*, Plaintiffs intimate that the claimant's allegations that he was "greatly concerned and worried" by the disclosure of his Social Security number gave him standing to sue. (Resp. 10 n.4 (quotation marks omitted; quoting *Chao*, 540 U.S. at 617–18)). But that argument is a stretch, especially given that the Court minimized those very allegations as "conclusory[.]" *Chao*, 540 U.S. at 617–18 (alteration added; citation omitted).

Plaintiffs' argument also fails to harmonize *Chao* with later developments, namely, *Clapper* and its progeny. Those cases do not permit treating a plaintiff's allegations of inconvenience or stress as constitutionally sufficient. *See, e.g.*, *Clapper*, 568 U.S. at 416 (rejecting argument that incurring costs based on nonparanoid fears of future harm is a qualifying injury under Article III). Perhaps the best way to make sense of *Chao*, considering *Clapper*, *Tsao*, and the like, is that the claimant's Social Security number in *Chao* was disclosed — not just accessed — in violation of a congressional mandate. *See* 540 U.S. at 617. If that is so, *Chao* provides Plaintiffs no refuge: here, Plaintiffs do not allege violation of a federal statute and allege only that some employees' Social Security numbers *may* have been accessed; not that they *were* accessed, disclosed, stolen, or misused. Whatever *Chao* stands for, its implicit standing conclusion does not warrant disregarding a veritable wall of intervening precedent.

To conclude, the SAC fails to plausibly allege a risk of future injury sufficient to trigger federal subject-matter over Plaintiffs' claims.[7]

---

[7] Other courts have reached the same conclusion when addressing similar allegations of potential harm resulting from data breaches. *See, e.g.*, *McMorris*, 995 F.3d at 304; *Beck*, 848 F.3d at 274–75; *Reilly v.*

16

**B.  Expenditures to Mitigate the Risk of Future Injury**

*Second*, Plaintiffs contend their efforts to mitigate the risk of having their identities stolen establish standing.  (*See* Resp. 13).  Once again, *Clapper* provides guidance.

In *Clapper*, the respondents argued that "costly and burdensome measures" they had taken to protect the confidentiality of their communications gave them standing to challenge a federal statute authorizing surveillance of foreign individuals.  *See* 568 U.S. at 415.  The argument was "unavailing[,]" as the Court put it, "because the harm respondents s[ought] to avoid wa[s] not certainly impending."  *Id.* at 416 (alterations added).  The Court explained that litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Id.* (citations omitted).  In other words, if a plaintiff fails to allege an adequate risk of future harm, no mitigative efforts she makes to prevent that speculative harm will give her standing to sue.

*Muransky* and *Tsao* echoed this logic.  Building on *Clapper*, those decisions recognized that "any assertion of wasted time and effort necessarily rises or falls along with th[e] Court's determination of whether the risk posed . . . is itself a concrete harm."  *Muransky*, 979 F.3d at 931 (alterations added); *see also Tsao*, 986 F.3d at 1344–45.  "To hold otherwise would allow 'an enterprising plaintiff to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear.'"  *Tsao*, 986 F.3d at 1345 (alteration adopted; quoting *Clapper*, 568 U.S. at 416).  Plaintiffs implicitly concede this point, acknowledging that *if* a plaintiff

---

*Ceridian Corp.*, 664 F.3d 38, 43–44 (3d Cir. 2011); *In re Practicefirst Data Breach Litig.*, No. 1:21-cv-00790, 2022 WL 354544, at *4–6 (W.D.N.Y. Feb. 2, 2022) (report and recommendation); *Legg v. Leaders Life Ins. Co.*, No. Civ-21-655, 2021 WL 5772496, at *7–8 (W.D. Okla. Dec. 6, 2021); *In re Cmty Health Sys., Inc.*, No. 15-cv-222, 2016 WL 4732630, at *10 (N.D. Ala. Sept. 12, 2016); *Duqum v. Scottrade, Inc.*, No. 4:15-cv-1537, 2016 WL 3683001, at *4 (E.D. Mo. July 12, 2016); *see also Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 910 (7th Cir. 2017).

has "shown a substantial risk of future identity theft or fraud, 'any expenses [she has] reasonably incurred to mitigate that risk likewise qualify as injury in fact.'" (Resp. 13 (alteration added; quoting *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 59 (D.C. Cir. 2019)); other citations omitted).

Simply put, Plaintiffs' allegations that they made efforts to minimize the risk of identity theft do not supply an independent basis for their standing to sue. Those allegations depend on the sufficiency of Plaintiffs' already-rejected theory of standing: that they have plausibly alleged a substantial risk of future harm. Because that primary theory fails, its companion risk-mitigation theory also fails. *See Muransky*, 979 F.3d at 931; *Tsao*, 986 F.3d at 1344–45; *In re Equifax*, 999 F.3d at 1263; *Beck*, 848 F.3d at 276–77; *Cotter v. Checkers Drive-In Rests., Inc.*, No. 8:19-cv-1386, 2021 WL 3773414, at *6 (M.D. Fla. Aug. 25, 2021).

### C.  Lost Value of Plaintiffs' PII

*Third*, Plaintiffs assert the allegedly decreased value of their PII establishes their standing under Article III. (*See* Resp. 14–15). Other plaintiffs alleging their PII was compromised by a data breach have raised a similar theory of standing — diminished value of their PII — with mixed results. Some district courts have rejected these arguments. *See, e.g.*, *In re Practicefirst*, 2022 WL 354544, at *7; *Cooper v. Bonobos, Inc.*, No. 21-cv-854, 2022 WL 170622, at *5 (S.D.N.Y. Jan. 19, 2022); *In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243, 1257 (M.D. Fla. 2021); *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 755 (W.D.N.Y. 2017), *reconsidered by* 304 F. Supp. 3d 333 (W.D.N.Y. 2018), *clarified by* 502 F. Supp. 3d 724 (W.D.N.Y. 2020); *Mount v. PulsePoint, Inc.*, No. 13 Civ. 6592, 2016 WL 5080131, at *6–7 (S.D.N.Y. Aug. 17, 2016); *Torres v. Wendy's Co.*, 195 F. Supp. 3d 1278, 1284–85 (M.D. Fla. 2016). Other district courts have embraced them. *See, e.g.*, *In re Marriott Int'l, Inc. Customer*

*Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 461–62 (D. Md. 2020); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-02752, 2017 WL 3727318, at *13–14 (N.D. Cal. Aug. 30, 2017); *see also In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617, 2016 WL 3029783, at *15–16 (N.D. Cal. May 27, 2016).

This diminished-value theory of standing in data breach cases might be relatively new, but the constitutional underpinnings remain the same.  The question courts must answer when assessing allegations of diminished value to PII is, still, whether the plaintiffs have plausibly alleged an actual, concrete injury in fact.  *See Trichell*, 964 F.3d at 996.  With that framework in mind, it is important to consider what Plaintiffs allege — and what they do not.

Plaintiffs *do* allege that a black market for consumer PII exists on the dark web.  (*See* SAC ¶ 58).  They *do* allege that criminals are willing to pay for sensitive PII on the black market.  (*See id.* ¶¶ 58–59, 63).  And they *do* allege the ransomware attack diminished the value of their PII, which they call "a form of intangible property[.]"  (*Id.* ¶ 75 (alteration added)).

These allegations do little to establish Plaintiffs' standing.  To begin, the allegation that Plaintiffs have a property interest in their PII is a legal conclusion, and an unsupported one at that. It is therefore entitled to no assumption of truth.  *See Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted).  Likewise, the SAC's allegation that Plaintiffs' PII decreased in value as a result of the ransomware attack is little more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citation omitted).

The question, then, is whether Plaintiffs' remaining allegations plausibly imply that their PII decreased in value because of the data breach.  And it is here that what Plaintiffs *do not* allege becomes critical.  Plaintiffs *do not* allege that there exists a legitimate market for consumer PII. Nor, wisely, do they allege that they ever intended to sell their PII to criminals on the black market.

*See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 30 (D.D.C. 2014) ("Plaintiffs do not contend that *they* intended to sell this information on the cyber black market in the first place, so it is uncertain how they were injured by this alleged loss."). These omissions dictate rejection of Plaintiffs' diminished-value theory of standing because, without any allegation that a market for legitimate sales of PII exists, Plaintiffs cannot, and do not, plausibly allege that the ransomware attack prevented them from profitably participating in that market.

Hedging their bets, Plaintiffs do not rest their diminished-value theory of standing on the SAC's allegations alone. In their Response, they allude to a legitimate market for PII, citing an article outlining companies' increasing willingness to pay for consumer data. (*See* Resp. 14 (citation omitted)). But this unalleged article cannot change the analysis. "[A]rguments are not allegations." *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, No. 17-cv-02824, 2019 WL 281370, at *10 n.14 (N.D. Cal. Jan. 22, 2019) (alteration added; citing *Twombly*, 550 U.S. at 586). What matters is that the SAC does not *allege* the existence of a legal market for the sale of PII. Plaintiffs may unlock the courthouse doors only with plausible allegations that jurisdiction exists, *see Muransky*, 979 F.3d at 927–28; *see also* Fed. R. Civ. P. 8(a)(1) — not by way of post-pleading literature review.

But even if the Court could credit the information contained in Plaintiffs' unalleged article, their diminished-value theory of standing would still fail. The article expands on developments some courts have recognized:

> Many companies . . . collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services. To take a few examples, many businesses offer goods and services such as wifi [sic] access, special access to products, or discounts in exchange for a customer's personal information. Consumer [sic] choose whether to exchange their personal information for these goods and services every day. . . . Further, the value of

> personal identifying information is key to unlocking many parts of the financial
> sector for consumers. Whether someone can obtain a mortgage, credit card,
> business loan, tax return, or even apply for a job depends on the integrity of their
> personal identifying information.

*In re Marriott*, 440 F. Supp. 3d at 462 (alterations added).

Assuming these unalleged observations to be true, it is difficult to see how the ransomware attack could plausibly have devalued Plaintiffs' PII or how such allegedly diminished value would be fairly traceable to the attack. Plaintiffs presumably still know their Social Security numbers, dates of birth, and email addresses. Nothing prevents them from exchanging their email addresses for Wi-Fi access and exclusive discounts at their local coffee shops. Nor do the SAC's allegations yield a reasonable inference that the attack prevents Plaintiffs from giving companies permission to sell their data to advertisers who will target them for special deals.

At bottom, Plaintiffs' diminished-value theory assumes that the ransomware attack afforded companies with whom Plaintiffs would voluntarily trade their PII access to Plaintiffs' PII without Plaintiffs' permission. But what basis exists for that assumption? None, in the Court's estimation.

The SAC does not allege otherwise legitimate companies' mass participation in the black market for PII. It also does not accuse anyone in particular of carrying out the ransomware attack at issue here. (*See* SAC ¶ 6). If, for example, Plaintiffs had alleged that a coffee shop refused to give them a coupon for a discounted latte because the shop had already obtained Plaintiffs' PII on the dark web, then perhaps Plaintiffs could make a plausible case that standing exists. But the SAC's failure to allege such outlandish scenarios only highlights that Plaintiffs' diminished-value theory rests on unpleaded and highly speculative assumptions.

The Seventh Circuit rejected a similar standing argument in *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909. In *Gubala*, a plaintiff subscribed to cable services provided by the defendant,

Time Warner, and in doing so gave the defendant his date of birth, address, telephone numbers, Social Security number, and credit card information. *See id.* at 910. Two years later, the plaintiff cancelled his subscription, only to find out eight years after the cancellation that the defendant had retained his PII in possible violation of federal law. *See id.* The plaintiff sued, and a district court dismissed his case for lack of standing. *See id.*

On appeal, the plaintiff argued, among other things, that the defendant's unlawful retention of his PII diminished the value of the information. *See id.* at 912–13. Writing for the panel, Judge Posner rejected this argument as "gibberish." *Id.* at 913. He explained that "Time Warner did not take the plaintiff's personal information away from him; he still has it (unless he tore up his birth certificate, credit card information, etc.); he hasn't been deprived of anything; and he isn't asking Time Warner to return his personal information in its files to him[.]" *Id.* (alteration added). The same is true of Plaintiffs' claims here. Plaintiffs, like the plaintiff in *Gubala*, "still ha[ve]" their PII and have not "been deprived of anything[.]" *Id.* (alterations added).

In the end, the failure of Plaintiffs' diminished-value thesis boils down to a basic idea: "No concrete harm, no standing." *TransUnion*, 141 S. Ct. at 2200. The SAC does not adequately allege a devaluation of Plaintiffs' PII — even assuming a legitimate market for their PII exists — because it does not plausibly explain how the ransomware attack could have harmed Plaintiffs' abilities to sell their PII. Absent any such explanation, Plaintiffs' diminished-value argument founders, as many courts that have addressed this argument have recognized. *See, e.g.*, *In re Practicefirst*, 2022 WL 354544, at *7; *Fero*, 236 F. Supp. 3d at 755; *In re 21st Century Oncology*, 380 F. Supp. 3d at 1257; *In re SAIC*, 45 F. Supp. 3d at 30; *see also Provost v. Aptos, Inc.*, No. 1:17-cv-02120, 2018 WL 1465766, at *4 (N.D. Ga. Mar. 12, 2018) ("Plaintiff has failed to allege with particularity any facts explaining how her personal identity information is less valuable than it was before the

[b]reach." (alteration added)).

### D. Unpaid Wages

*Fourth*, and finally, Plaintiffs assert that one of Cavazos's alleged injuries — unpaid wages — is fairly traceable to Defendant's failure to guard against the breach of the Kronos Private Cloud.  Close scrutiny refutes this contention as well.

As explained, Article III requires that the plaintiff's injury be "fairly traceable to the challenged action of the defendant."  *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) (quotation marks omitted; quoting *Lujan*, 504 U.S. at 560).  Federal courts have power to "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."  *Id.* (citations and quotation marks omitted).  To be clear, to have standing, a plaintiff need not allege or show proximate cause.  *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (citation omitted).  "Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the traceability requirement."  *Id.* (citation omitted).

Still, when "a case is at the pleading stage, the plaintiff must 'clearly allege facts demonstrating' each element" of standing.  *Spokeo*, 578 U.S. at 338 (alteration adopted; citation and footnote call number omitted).  Not only that: a plaintiff "must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention."  *Warth v. Seldin*, 422 U.S. 490, 508 (1975) (footnote call number omitted).

Plaintiffs allege that Defendant entered into "contracts with its customers to provide payroll processing services[.]"  (SAC ¶ 170 (alteration added)).  As far as how these alleged obligations are connected to the data breach, the SAC says little.  In Plaintiffs' telling, the data breach

adversely affected Defendant's "ability to timely process payroll for . . . customers[;]" and, by extension, employees of those customers, such as Cavazos. (*Id.* ¶ 164 (alterations added)). Plaintiffs further allege that Pepsico has not paid Cavazos since "December of 2020" "[a]s a result of the" ransomware attack. (*Id.* ¶ 89 (alteration added); *see also id.* ¶¶ 165–67, 173–75).

These allegations do not satisfy Article III. Cavazos's assertion that he has not been paid "[a]s a result of the" breach can be described only as threadbare. (*Id.* ¶ 89 (alteration added)). As such, the Court may not simply take Cavazos's word for it. *See Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019) (affirming dismissal for lack of standing because plaintiff's "threadbare allegations" prevented court from determining whether injury was "fairly traceable to the challenged statutes").

And Cavazos's suggestions that the data breach prevented, in some unspecified way, Defendant from timely processing payroll make little difference. Those bare, unsupported allegations are not "specific, concrete facts demonstrating that the challenged practices harm him[.]" *Warth*, 422 U.S. at 508 (alteration added; footnote call number omitted). "[I]t is not enough that a complaint sets forth facts from which [courts] could *imagine* an injury sufficient to satisfy Article III's standing requirements, since [courts] should not speculate concerning the existence of standing, nor should [they] imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none." *Aaron Private Clinic Mgmt.*, 912 F.3d at 1336 (alterations added; citations omitted).

Even accepting as true Cavazos's allegation that the data breach interfered with Defendant's payroll processing, the Court would be forced to speculate about how the ransomware attack affects payroll processing; why Defendant's customers cannot pay their employees if Defendant cannot process payroll; and how the attack prevented, and continues to prevent,

CASE NO. 22-20105-CIV-ALTONAGA/Torres

Cavazos's employer from paying him on time.  On these critical questions, "there are just too many unknowns."  *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1126 (11th Cir. 2019); *see also Clapper*, 568 U.S. at 414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").

## IV.  CONCLUSION

"A dismissal for lack of subject-matter jurisdiction is not a judgment on the merits and is entered without prejudice."  *Stalley*, 524 F.3d at 1232 (citation omitted).  Furthermore, when a plaintiff responds to a motion to dismiss and does not request leave to amend her complaint, a district court is "not obligated to *sua sponte* grant . . . leave to amend prior to dismissing her complaint[.]"  *Kwok v. Delta Air Lines, Inc.*, 578 F. App'x 898, 902 (11th Cir. 2014) (alterations added).

Here, Plaintiffs have already amended their operative pleading twice.  (*See* Compl. [ECF No. 1]; Am. Compl. [ECF No. 19]; SAC).  The deadline to amend pleadings was April 21, 2022 (*see* Am. Order Setting Trial [ECF No. 26] 1), and Plaintiffs did not request leave to amend before or in their April 18 Response to the Motion.  Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant, UKG, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint **[ECF No. 31]** is **GRANTED**.  The Second Amended Class Action Complaint **[ECF No. 30]** is **DISMISSED without prejudice**.  The Clerk of Court is directed to mark this case **CLOSED**.

**DONE AND ORDERED** in Miami, Florida, this 10th day of May, 2022.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record